Bogan v. MTD Consumer. We'll hear from Mr. Wade first. Thank you, Your Honor. May it please the Court. Your Honor, the jury in this case found that Mrs. Bogan is a victim of sex and race discrimination and awarded $1 in nominal damages. We did not appeal that ruling to this Court, and we're here about primarily the issue of reinstatement. We see no reason why she should not have been reinstated for a job. I'd like to offer to Your Honor, discuss with Your Honor, the reasons why they claim they could not reinstate her and why they defend the trial judge's finding that reinstatement was not feasible. It looks like it appears to me from reading their brief and what's emphasized in their brief, they say it's because she was a rule-breaker. That is, that she broke the rules when she was there. We have a no-rehire policy. We can't have her back because she's a rule-breaker. Your Honor, that argument is directly contrary to what the jury found. The Court instructed the jury in direct compliance with the statute, just followed the statute to the letter on page 1624 of the record. And this is the instruction that the Court gave the jury. If you find by preponderance of the evidence that race or gender was not a motivating factor, then you must find for the defendant. And then it goes on to say you must determine, then after that, you must determine whether MTD proved by preponderance of the evidence that it would have terminated Meg Bogan's employment even if it had not considered her race or gender. In other words, the Court just exactly instructed the statute and said if we prove it was a motivating factor by preponderance of the evidence, then the burden shifts to them to show that they would have terminated her anyway. And by finding for us, we have to assume the jury followed the Court's instructions. The jury necessarily rejected their defense, which was essentially that she was breaking their rules. I'm not going into the details of it unless your Honor asks me to because it makes no difference because the jury has rejected that defense. I will point this out to what they said in closing argument. They made it very clear that that was their defense, that she had broken their rules, their attendance rules. And we said that was all pretextual. But on page 1644, this is defense counsel's closing argument. He says, this is what he says. He says, there's no dispute. We're not disputing that she was not a good employee when it came to running that machine. You've heard our own people say they like her. I like Ms. Bogan. She's a good person. But this is not about Ms. Bogan as a person as to whether we don't like her because she had a bad personality. It was a question of whether she could comply with the manager's instructions and follow the rules that everybody else had to follow. So that is the very defense. The things they argue in the brief about rules she had broken and our contradictions of it, that's just been rejected by the jury. So it's not consistent with the Seventh Amendment, Your Honor, to say, well, they had the right not to take her back because they considered that she wouldn't follow the rules. That's what's been rejected. And that is their primary reason why they say they can't reinstate her. I'm going to discuss the other reasons. But I would urge the Court that the Court, under the Seventh Amendment, there's no authority for the judge to say, as she did in her opinion, well, I think that they had a problem with her or accept some idea that she was not following the rules or they would terminate her anyway for that reason. They have some smaller reasons. That's the main one. But here are the other things. They say, well, we have a peer review program, and this would cause bad morale in the peer review program. Well, Your Honor, every employer has got some method they use to discharge employees. They do have a peer review. The personnel manager sits in on it. And how independent they are, I think, is open to question. But regardless, they do have a peer review. Every employer could say, well, it's going to affect my morale. I'm the personnel manager, and this is going to cause bad morale by me if the Court reinstates somebody. There was no testimony, Your Honor, by any worker, anybody that worked with her, that she would cause any morale problem or they didn't want her back. The people that sat on that peer review committee were, first of all, the people from the personnel department. They don't have a vote. They sit there, but they don't have a vote. They run the meeting, but they don't have a vote. But then these hourly workers sit on it. Nobody from out in the plant, no worker ever said this is going to cause a morale problem if you bring Ms. Bogan back to work. So that's not a reason. They didn't produce any evidence of it just for the personnel manager to say, well, I think it will be bad for the peer review committee's morale if we bring her back. I just can't imagine that that's a reason. I guess it's bad for somebody's morale whenever they reinstate somebody because they obviously want her to fire. Is this an issue of hearsay or is it a matter of those who said it clearly had no source of information? I wouldn't say that, Your Honor. I'd say it's no substantial evidence, you know, for the personnel manager to say that, to just say, well, I think it would. I'm just saying there's no substantial evidence. If they produced substantial evidence, for example. Well, the hearsay I mean is if the personnel manager had said that he or she had talked to individuals or had been so informed. And I don't know if you're raising that sort of objection or did the personnel manager not even say that? Your Honor, I don't believe that was said. I just think he just expressed his opinion. I read the transcript. I don't remember that being said. Well, I trust your memory, but we may look at that. I don't trust it myself, but my recollection is he, that was the personnel manager's opinion that it would harm these hourly workers. Of course, she was working in this highly technical department. I'll get to that in a minute. She didn't work with these workers that were on the peer review committee. It was a three to two vote, by the way. But regardless, I just can't imagine every employee could say that. Well, it hurts my feelings that the courts put her back to work. Now, the next thing that she said, well, there was a change in careers. Your Honor, I think what the district court had confused is we're talking about there was a time when she first lost her job. There was slightly over a year that she went without actively looking for other employment. She was finishing up her degree in social work. She did want to be a social worker. She did want to go to seminary, and she did spend about a year. That may be why the jury, you know, turned a verdict of no, of $1, because they thought she didn't mitigate. But at this point, we're back after. We're hearing this case in 2017. She's been working since August of 2015. She's been working as a the title of the job is technical liaison with a Toyota subcontractor. Nothing in the record describes the nature of the job. I think the burden was on them. Nobody talks about exactly what are you doing. Neither side did that. But we know they're a Toyota subcontractor, so they're obviously building car parts. And what she was doing is making dies for as a tool and die worker. She was making dies for tools to build lawnmowers. So you can't say they're just two totally different things. But to say she changed careers, the court's talking about what happened after she lost her job back in 2013. Doesn't that affect reinstatement? Your Honor, I don't see how it does, because I don't understand why it would. I'm sorry. I'm not following. Well, you said that it was after she lost her job. But we're talking about reinstatement, which is after she lost her job. So she did change careers during that period. Your Honor, I understand the question. I think here's the point, though. She did. She did unsuccessfully attempt to get other work, other social work to change careers. But when she was unable to, when she was unable to, in 2015, she forgot that. She wasn't able to do that. And she went back and got this job with Toyota, the automobile parts people. So at this point, the fact that she made it at some point earlier, but that's all been rescinded then when she goes back to Toyota and gets, not Toyota itself, but a Toyota supplier. She didn't do the same job at Toyota that she had been doing. All right. Let me mention this, Your Honor. The burden of proof is on the defendant. There is no proof. For example, there's no proof of this. This thing would be crucial. There's no proof that there were any jobs available at Toyota or anywhere else making what she was making that she could have gotten. The proof that they put on is the thing the court relied on. Lawyers ask questions about, did you know there were thus and such jobs, machinist jobs or tool-and-dye jobs available? It didn't say when they were available. You know, just were they available? Never put on any evidence they were available. The lawyer just said that. They went through four or five jobs and said they were available. Well, available when? She had only been, I'll get into that in a minute, but there's no proof that there were these other available jobs that she should have gotten. And, Your Honor, she was working for a Toyota supplier, and she had gone in the space of two years from making $11 an hour to making $15 an hour. So to say that it's unreasonable, what they're saying is she should have kept on trying to find other jobs or gotten one of these other jobs after she's already making, gone from $11 an hour to $15 an hour. And all we know about the jobs is they involve work on machinery. That's really all we know about it. We know it was an extremely complex job, but there's no proof in the record that the defendant didn't offer any proof that we have a job that pays just as much as you have that you could get. They just said, well, these jobs were available at some time. The lawyers say that. What the lawyer says, Your Honor, is not evidence. Well, there's also the finding of the district court that subsequently this machine had been updated and they didn't have anybody that was doing just that. They all had to do other things. Yes, Your Honor, that brings to what I think is a really important point. That's exactly right. And, you know, we live in a ñ and both sides, I have no reason to dispute that. This is a highly technical ñ I mean, for Tupelo, Mississippi, this is a big-time job. She has to go to junior college two years to qualify for it and then has a long training period. The computer programs and all that on it, which is way beyond my understanding, but I accept fully that it's a job that's changing all the time. But if they had not discriminated against her, she'd be right there with the changes. So to rely on that, the fact that this job is changing, that would mean, Your Honor, in our society now, when all the good jobs are technical and changing all the time, as Your Honor knows what we had in law school, you can't even be a lawyer if you walked out with what we taught. Now everything's changed, and it's in every field. Everything is complex and changing. And if they had not discriminated against her, she would be there to keep up with those changes. So if Your Honoró Doesn't that ñ I mean, I understand your critique of that fact, but it seems that would also be true of, you know, the case law relies, and the judge did here, on the fact that, well, someone ñ the position's full now. The company doesn't have a spot for this employee. Same thing you just said. I mean, if they hadn't discriminated against her, it would have been her spot. They wouldn't have hired these other people. I mean, it just seems that's a critique of the larger reinstatement case law, which might be a good one, but I don'tóour case law doesn't buy into it. Yes, well, Your Honor, here's the problem. I don't think the case law that I can find really addresses. We filed our motionóthe jury majority was in January. We filed our motion in February for reinstatement. In the springónow this just came out by accident when we were cross-examining their witnesses. They had just filledóthey brought in a new employee in the spring, right before we had the hearing in August. They didn't give a month. But the personnel manager testified, we have just hired a new employee into that department. This is with the motion for reinstatement pending. So it looks to me like it goes back to these old desegregation cases. That's all I can say. You know, Your Honor, federal courts, within our desegregation order and after it's entered, they hire a white employee, and then say you're going to have to displace an employee. But in the first place, I don't think it's legitimate to say, well, when she's asking for her job back, you hire a brand-new employee, even though you've got one that's had two years of junior college training, has worked successfully, gotten the top evaluations for two years. You go and hire a new employee while Ms. Bogan is asking for her job back. It looks at the very least, they tell the court, well, we've got an emergency or something. We need some ruling. But it throws a different light on it when they hire somebody, no one in her motion is pending, and we're fixing to have it heard. The other thing, Your Honor, the districtó where that job wasn't filled, if they'd waited for her to win or lose her case and not hired somebody to work there. It's a very short period of time, Your Honor. It wasóthey said the spring, so I can't give you a definite date. He said he didn't remember what date. It was the spring. We had the hearing in August, so it has to beó But they didn't know when it was going to be a decision. Well, they would pretty much know, Your Honor. I'd have to look at the docket to see when the notice of the motion hearing came out. But I understand that he wouldn't know when the court was going to rule it. But I would just thinkówe're talking about equity hereó if you've got a plaintiff that the jury has found was discriminated againstó and I can't justify why they gave her dollars because she did go a year trying to switch careers back in the day. But we've got an employee who said I was discriminated against. The jury has found that I was discriminated against. But while the motion is pending, we don't know when it's going to rule. The court could have ruled the next day. It looks like theyóin equity, fairness, they would have sought some guidance from the court instead of just hiring somebody, thereby creating a defense for them to the case. The other thing is, Your Honor, Judge Aycock asked heróand I thought this was very pertinent questionsó well, would you go back to just being an assembly worker? She worked for 20 years as an assembly worker. About seven or eight different jobs she had, mostly inspection and quality control. And she said, yes, I would. I'd take an assembly worker job. Well, all we talked about at the hearing was we can't take you back as an MTD operator. Well, they can give her an assembly worker job back. And here's the reason. I want to talk about what I think is one of the equitable things that they say that I think is really in our favor. Two months before this hearingóand this is what came out at the hearingó two months before this hearing, she had been fired from the job that she'd had in 2015. The reason they gave her wasóthis was not explored through discovery because it was post-trialó the reason they gave her was you parked in the customer parking lot and you'd been warned not to do that. She testified at the trial that never gave me any warning not to park in the customer parking lot. That's on pageówell, it's the very first page or two of the evidence review. It's 1683. 1683 in the record. That's when we start the post-trial evidence review. But we never really had any hearing about that except that she said they had never told me I could not park in the customer parking lot. But regardless, she is without a job. She testified that once she got fired from the Toyota supplier, she went not only toó I'm sorry, was to and that, but she went everywhere anybody might have a possibility, including Sonic Drive-In, nursing homes, and everywhere you can get a hearing. This was hearsay, Your Honor, but there was no objection to it at the hearing. She went to a private employment agency who had told her, here's the reason you can't get a job is because you've been terminated from the previous one. That's the reason, and that's why she believed it was. So she's in a situationóshe's a 57-year-oldóI know I wasn't born yesterday, so y'all are much closer to it than me. It's really hard to get a job in North Mississippi if you've been fired from a job. And an older black, older personóI'm wondering whether I don't offend anybody's sensitivities here, but it's hard for old people to get jobs. And you're talking about an older black woman who's been fired from two jobs. So that's why we think it's important that they give her a job back, for heaven's sake. They said she was a good employee, and this new employee that they just hired in the spring can't have the record that she had. Mr. Wayne, we're always glad to hear from you, but your time has run out. So sorry, Your Honor. Good afternoon. May it please the Court. My name is Robin Taylor, and I represent MTV Consumer Products Incorporated in this appeal. Now we are asking today that this Court affirm the district court's denial of both reinstatement and front pay. Now that district court denial of reinstatement and front pay is completely consistent with the jury's verdict. During trial, the jury was instructed that if they find from a preponderance of the evidence that Ms. Bogan is entitled to a verdict on liability in accordance with the instructions, but do not find that she suffered actual loss or injury, then they may return a verdict in a nominal sum such as $1. And that is exactly what the jury did. Reinstatement and front pay are designed to compensate for loss, and the jury found that Ms. Bogan had no loss. I presume that the jury found, as did the district court, that Ms. Bogan did change careers, and therefore she had no loss. Therefore, the judge's finding of a denial of reinstatement and a denial of front pay is consistent with the jury court's finding. Now, Mr. Wade, during his oral argument, really focused on the reinstatement piece and why he believes that that reinstatement or why the district court abused its discretion in denying Ms. Bogan's request for reinstatement. Let me clarify that. Mr. Wade started by saying, I believe that the only issue before us is reinstatement, the only issue that he's bringing. Maybe he doesn't mean on the appeal at all because I didn't read his briefs that way. Maybe we should get a clarification when you get back up here. But it sounds like that is our issue on this case, reinstatement. So based on Mr. Wade's presentation today, he indicated that he is primarily arguing that the court abused its discretion because that's our standard of review as it relates to Ms. Bogan's request for reinstatement. In the briefing on appeal, he has also raised the issue of the district court's denial of Ms. Bogan's request for front pay. But that's been waived, so you don't need to address it. Well, Judge Weiner, I like that idea, so I will not address that. I will focus wholly on the reinstatement issue. Judge Acock, in her opinion, looked at all of the factors that the Fifth Circuit has said that a district court needs to consider before it finds whether reinstatement is feasible or not feasible. As I stated earlier, the district court, we believe that the district court's nominal finding was a finding that Ms. Bogan had changed careers. I believe that during the hearing on reinstatement, Judge Acock specifically asked or questioned Ms. Bogan about her intent to change careers. If you look on Record of Appeals 1718, Judge Acock asked Ms. Bogan, So, did you change careers? I mean, in your mind, once you got that social work degree, did you start seeking jobs in the social work area? Ms. Bogan's response was unequivocally, I did. So the trial court's finding that Ms. Bogan has changed careers, it is really rooted in Ms. Bogan's admission during the hearing for reinstatement and front pay. It is rooted in Ms. Bogan's educational pursuits. It's also, there's one paragraph that says, among many, one paragraph that says, one reason not to reinstate her is that she violated the company's rules, you know, about this lunch stuff, and they wouldn't want her back because they would have fired her anyway. But isn't the verdict necessarily saying that was a pretextual reason and instead it was race or sex discrimination? So I think where I would like to start from is the consideration of whether there is animosity between NTD and Bogan. That is a valid consideration. Wouldn't there always be when someone gets sued for something as highly charged on both sides as sex and race discrimination? And courts have said that really if there really is no animosity until the actual litigation, that's not the animosity that the Fifth Circuit is considering. And Judge Acock, in her opinion, did not focus on animosity related to the litigation. What Judge Acock focused on is she said that during that hearing on reinstatement, the testimony from Tad Cherry, who is the human resource manager, she said that the animosity was palpable, that Mr. Cherry went on at length about the employee peer review board and how bringing back an employee after the employee peer review board had affirmed her termination would destroy the integrity of that board. But counsel, I'm just probably repeating what Judge Costa asked you. The jury has dealt with the validity of her termination and said it wasn't valid, that it was based on discrimination. So are you saying that if pursuing what ultimately she was vindicated for, no relief, which is why we're here today, that meant anything to her other than an assertion that she had been improperly fired, are you saying that if her pursuing her rights causes the company maybe reasonably to get upset with her, that that's a reason that's relevant to us on reinstatement? So I think that that is one of the many factors that Judge Acock considered, and I think what makes this case different from perhaps some of the ADA cases that Mr. Wade cited in his brief is that the jury was instructed that the motivating factor, right, that her race and gender was a motivating factor in the employment discrimination. There really is no dispute that she was counseled about her schedule, that there was a disciplinary process where the employer demonstrated to Ms. Bogan that they were unhappy with her attending classes. I think what the jury's verdict says is that it wasn't a good enough reason to terminate her, but the fact that there had been a performance history that is documented and that Ms. Bogan admits to those occurrences of the final written warning and then the termination decision surrounding her employment and that she had been informed that she could not attend class during working hours, that is just part of the consideration that Judge Acock, it was part of the facts that the jury considered and that Judge Acock considered during the reinstatement hearing. But it's not a matter of whether the reason's good enough. As you well know, you really don't even need a reason as long as it's non-sex-based or non-race-based. So wouldn't the jury have had a found that, no, this reason about coming back, taking too long of lunch breaks, that that was pretextual because all these other people were, the evidence showed, allowed to do that and weren't punished? So the real reason, at least one of the major reasons, was race or sex discrimination. So the jury was instructed on the pretext analysis. And one of the things that it said is that, you know, if you find on a preponderance of the evidence that Ms. Bogan wouldn't have been terminated except for her race and or gender, then you should find for Ms. Bogan. So I think in that instruction, the jury found that but for, and it's the jury's finding, but for her race and her gender, she would not have been terminated. I don't think it disallows the district court from considering, as one of many factors on her reinstatement consideration, whether or not there's animosity between the parties related to that employment. And if you look in the, I believe it's the Dell Champs case, in that case the court really talks about that and says, they talk about the employer's rationale was that it was a performance-based termination for an employee, which the jury rejected. It was an ADA case. However, the court goes back and says, you know, bringing this employee, there is no way this employee could be a satisfactory employee given the circumstances of this case. So I think that to require the court not to consider the factual circumstances leading up to a termination would kind of blindfold the court to the salient facts of whether or not there is animosity. And I think also under that animosity discussion, that the circumstances leading up to her termination was just one piece of that because the court also relied on the employee peer review board and the budget issues that . . . What do we do if we were to . . . there's four or five at least reasons the district court goes through. What if we think one or two is wrong and the others are all valid? What do we do in that situation? I think in that situation, you look at the abuse of discretionary standards. And in looking at the cases, I have not been able to find another case in the Fifth Circuit where you have a district court that addresses and considers because that's the language that they use in the Calisetta case. The district court has to address and consider the factors. And here, when the court . . . and it's not an element analysis. It's a factor analysis. And so, let's just say, for example, you determine that one of a piece of one of the factors that Judge Acock considered is somehow flawed in the analysis. It does not disregard the fact that Judge Acock looked at the fact that she had changed careers, looked at the fact that there had been a very complex, sophisticated machine that had gone through lots of updates over the last four years, and that it would be very difficult for Ms. Bogan to go in on day one. I want to change those things, but how do we know how the district court would have weighed it if all of those shouldn't have been weighed, right? I mean, I guess it's a harmlessness thing we look at in a lot of contexts. Right. It would be under an abuse of discretion standard, which is a fairly deferential standard. But the discretion was exercised based on all these factors. If there was an impermissible factor, we don't know exactly how the district court would have exercised its discretion. So that is true. That is true. But I think that you look at the weight that the district court places on each one of the factors. And in the district court's opinion, under whether or not a comparable job or whether the feasibility of returning Ms. Bogan to work, she says it's extraordinarily low. And she looks at the fact that Ms. Bogan worked on this EDM wire machine for a very short period of time of approximately one year, and that Ms. Bogan had been out of the tool and die industry for four years after that and had not engaged in any other training in order to keep her skills sharp. Did the district judge consider what Mr. Wade was saying here today? Was there an offer either at the hearing or at some point prior to Judge Aycock's opinion that you take any job back with the company? So Ms. Bogan was asked during the reinstatement hearing whether she would accept any job with MTD. Her testimony, I believe, is a little equivocal about whether she would accept any job. But what was consistent is she said, I would accept an assembly job as long as you pay me as an EDM wire operator job. So I'll accept the minimum wage position, but you have to pay me $15 an hour that I would have been paid in the tool and die position. I believe that at one she kind of moved around a little bit, but I believe at one point she did testify to that. Do you agree that change of careers is just a factor in the list of things to consider? It doesn't cancel out cancel the need to be considering these others. Mr. Wade was saying she unsuccessfully sought to change her career, and now she can get back to what she was doing before. Is it accurate to say that is just one factor, whether she changed careers? So I think that the change of careers is one factor of many. I mean, it's not a threshold. It's not a gateway. If you change careers, you're out of the game altogether. Correct? You could still make your argument that you should be reinstated. I believe that that is true. I would remind the Court that there are Fifth Circuit decisions that find reinstatement is not feasible based on one of those factors after considering all of them. And the one that I think of is it's usually the animosity between the parties or that a job is not available. Are you saying, I mean, I think it would be unusual maybe in those cases to have the set of facts that we have here that somebody has been vindicated in asserting her rights all the way through the jury trial and has convinced the court system and has been upheld that she was discriminated against. Do any of those cases say that when such discrimination has been upheld, has been found, that animosity arising from asserting rights is relevant in this analysis? So I think that's the animosity from asserting rights. Asserting and being vindicated in asserting those rights. Are any of those cases you're talking about that situation? Yes, Your Honor. There are cases that find animosity related to litigation is not... Successful. What I'm trying to get to is successful litigation in which the individual has been found to have been discriminated against. Your Honor, I do not believe that is a proper consideration and I do not believe that Judge Acock relied on that as part of her animosity discussion between entities. But isn't that where the animosity is from? You were indicating that earlier, that it's this pursuit of this and I don't think workers' comp or what you were talking about earlier, but I thought you were acknowledging that her assertion of her rights after her termination was part of what created the animosity. So that is not what Judge Acock indicated in her opinion that she was relying on. I think that it would likely be inappropriate for a judge to consider animosity related to litigation as the evidence that the judge relies on on the animosity factor. And I would say this, Judge Acock did not put all of her discussion related to animosity under in that box of the employment-related animosity. It was also the significant human resource issues with bringing an employee back. How did the employee... It says it would look bad for the employee review process. How was she critical of the employee review process other than through filing a lawsuit? I mean, the employee review process, that's the end of her... As I understand it, they decide to terminate her. She's at an end. Isn't her criticism of that process through the filing of the lawsuit? I think that that's a very important question. So what Tab Cherry, the HR manager, testified about, he said we tell our hourly employees that this is in their hands, that they can volunteer for this employee peer review board and that they can hear the evidence and that MTD as a company is going to stand by whatever they say. And Tab Cherry's testimony was that in the history of his time with MTD, the management had never overturned a decision of the employee peer review board. So I think what Tab Cherry is saying, it's the morale of the hourly employees who we have told them that they have power in this process, the employee peer review board process. And it destroys the integrity of the employee peer review process. The cases speak, when they're talking about the discretion, because this is an equitable issue, they often, and I'll quote one case, Palisoda, it says the selection between reinstatement and front pay is discretionary with the trial court so long as the relief granted is consistent with the purposes of the ADA. And there's similar language. It almost could be read to say it's a choice and there has to be one of those equitable remedies. Is there a case you found where both were denied, like in this case? So yes, there is. So if you look, there are two cases that I direct the court's attention to. One of them is the... One of them is the Giles v. General Electric case, and that's 245 F. 3rd 474. In this case, the court denied back pay, the district court, finding that the plaintiff had failed to mitigate her damages, and the court found that reinstatement was not proper. So this is the district court's finding. When it came to front pay, the court allowed front pay based on the same mitigation evidence. The Fifth Circuit looked at that and said, you know, the district court could have denied front pay here. There was evidence. There was not an abuse of discretion. So I would argue that this Giles case, it indicates, it does not hold, it indicates that it is proper to deny both reinstatement and front pay, considering that both are equitable remedies. And then I would also argue that Title VII, the purpose of Title VII, is to compensate a plaintiff for injuries, and we have a jury finding here that the plaintiff suffered no actual injury or damage, and Judge Acock's ruling is consistent with that. And I would also direct the court's attention to the decision of Hansard v. Pepsi-Cola. And in that case, the court actually—and let me give you the site. It's 865 F. 2nd 1461. In that case, the court found that the plaintiff had failed to mitigate their damages. He had gone and started working in a flea market, had stopped looking for other employment. I see that my time is up. May I finish my statement? You can finish your statement. Thank you, Judge. But so he had gone. He had gone to work at a flea market. The court looked at that. The underlying court had not considered reinstatement. And so the Fifth Circuit said, you're going to have to go back and look at reinstatement on this piece. We're reducing the back pay. And they instructed the district court that if you find that reinstatement is not feasible, you must consider his failure to mitigate. And so I think that that is very strong language for the proposition that it's appropriate to deny both reinstatement and front pay. All right, counsel. Thank you. Mr. Wade, let me get a clarification from you. Whether you want to use a term quite like Judge Wiener did, are you saying the only issue we need to resolve is reinstatement? Your Honor, with all due respect to Judge Wiener, I didn't mean to abandon it. I just didn't get to it. That was not my intention, Your Honor. It's in the brief, and I don't intend to argue it. You're only going to discuss that. I'm sorry, Your Honor. Then what you're saying is you're only going to discuss reinstatement, but you're not abandoning your other claims. Yes. It's my understanding I'm not allowed to discuss it at this point because I just didn't get to it in the opening. There's a reason I didn't get to it. The back pay you didn't brief and challenge. Maybe that's the confusion. The back pay you, the jury's back pay award you did not appeal. Let me just say this about it. I disagreed with the jury's finding, but I thought it was supportable because she went a year without looking for a job while she tried to switch over to social work. So I thought it was supportable. I guess what I'm saying, back pay is not an issue on appeal. Front pay you briefed but didn't talk about today. Yes. But time and again, Your Honors, has said that the preferred remedy is reinstatement. And in this case, Your Honor, this is what I really think is telling. They tried to say, well, we know there's all these jobs out there. They gave this opinion testimony. There's empty jobs everywhere. They didn't give any specifics about the particular time. But then I asked the personnel manager, well, have you ever hired anybody that's been terminated and filed a civil rights suit? You've been a personnel manager at this country 22 years. And he said, I never have. Never had this come up. So to me, the problem is she's a branded lady, as I say, at Country Music. Her getting another job is just, you know, it's just almost beyond the pale. That's why she needs to be given the job back for reinstatement. After she got this MTD job, which is one of the best jobs in the plant, she had the highest rating you could get in performance, punctuality, getting along with peers. So to say that she suddenly changed and now we have this great animosity about her, the trouble is the only source of animosity is that she filed this suit. That is it. There's nothing else in the record that says that. And regarding counsel's things, well, you can just somehow get around what the jury has found. You just can't do that because the court instructed the jury that if they've shown they would have terminated her anyway, then you've got to rule for them. So the jury has already found that these problems they claimed they had with her was not the real reason for the termination. Your Honor, the reason I don't think I made myself clear, the reason to me that changing careers is not significant is that she retracted that. When she was unable to get a job in social work, she went back and got the same type of job. I know it's not as complex, apparently. But she got the same type of job, a job making automobile parts in a technical position, the same type of job. There's nothing in the record. And the burden of proof was on the defendant. There's nothing in the record to show that there's some job out there that she could have quit. Does the record show why she lost that job? Yes. The only thing it shows now, we didn't really get into this, she testified that they fired her about two months. She'd had the job for two years. They fired her two months before this hearing saying that you parked in a customer's parking lot and you'd been warned not to. She testified, I never had any such warning as that. They just fired me saying I parked in a customer's parking lot. I don't believe there's any basis to say anything about that except she lost the other job, which means she really needs this job. I mean, there's no discovery on that. And it seems like a mighty flimsy reason to, you know, fire somebody that's been there two years and they've given a five-year pay raise. But we haven't gotten into it, so we don't really know about that. But it's just another reason why they should have given her this job back. If they're not going to give her this job back, then let her work out in the plant. Counsel quoted her correctly. Of course she'd like to have the same amount of money, but she should have at least been offered a job in assembly that she's done for 20 years. So, Your Honor, we believe the court, the abuse of discretion has to be in light of the make-whole purposes of the statute, to make a person whole who's been discriminated against. And when you read the opinion in light of the make-whole purposes, she has not been made whole and won't be made whole, but we could at least make some effort toward her reinstatement. Do you agree with the characterization by a colleague on the other side that your client testified she would take basically any job, but it needs to be at the pay? In substance, that's correct. I don't think. That's in substance what you said. I can't give a court an exact quotation. Appreciate your help. Your Honor, I'm sorry. I do think that in light of the fact of her inability to get a job, she should at least have been given the opportunity even at a lower rate of pay. All right. Thank you. Thank you both.